## UNITED STATES v. GOWER.

### No. 968.

Circuit Court of Appeals, Tenth Circuit.

May 31, 1934.

A. E. Williams, Asst. U. S. Atty., of Tulsa, Okl., and Randolph C. Shaw, Sp. Asst. to Atty. Gen. (C. E. Bailey, U. S. Atty., of Tulsa, Okl., Will G. Beardslee, Sp. Asst. to Atty. Gen., and Thomas E. Walsh, of Washington, D. C., Atty., Department of Justice, on the brief), for the United States.

Glenn O. Young, of Sapulpa, Okl., for appellee.

Before LEWIS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge.

Appeal from a judgment of liability on a war risk insurance policy. Plaintiff, appellee here, alleged in his complaint that he enlisted in the active military service of the United States on or about June 26, 1918; that he was honorably discharged on August 2, 1918; that on July 15, 1918, while in the service, he suffered and sustained physical injuries, disease and impairment, viz., prolapsus of the rectum, injury to kidneys, back and bladder, and nervous and mental disorders; and that on that date he became and has since been continuously, permanently and totally disabled; that he presented his claim on said policy and filed it with the United States Veterans' Bureau on or about June 20, 1931. He instituted this suit on the 20th day of January, 1932.

The answer contains a general denial and a plea of the statute of limitations. Act of July 3, 1930, § 4, 46 Stat. 991, 992, U. S. Code, title 38, § 445 (38 USCA § 445).

■■ The policy lapsed for nonpayment of premiums on October 1, 1918, unless on that day or theretofore the plaintiff had become totally and permanently disabled. The burden was on him to prove that disability. His own testimony on that subject is this: On July 2, 1918, he became sick with diarrhea

and cramps and was taken to base hospital and there operated on July 8, 1918. He was suffering from prolapsus of the rectum, had a swollen stomach and hurt from the hips down, his legs felt like they were asleep or swollen, his kidneys and his back hurt him. He came home and has since suffered from prolapsus of the rectum. His bowel movements are painful, cause swelling and make him sick at times. He has been unable to work to speak of since he was discharged. He has noticed no improvement since he came out of the army. Before he went into the army he was a good man physically. After bowel movement he has to put the prolapsus back, which is very painful. He did not consult a doctor until 1919, that was Dr. Wells. He consulted Dr. King in 1925. Dr. King gave him some medicine, treated him twice. No other doctors treated him. He had not been to hospital since his return home, but had been examined by other doctors at various times. At first he drew compensation. It was cut off in 1923. He did not draw any more until 1928. On cross examination he testified that he had not worked any since he came out of the army, except to do chores about the house; that he lived on a farm. In 1919 he farmed twenty acres, in 1920 fifteen acres, and in 1921 twenty-five acres. Except the years 1924 and 1925 he had control of twenty to forty acres of farm land on which he was overseer. He had plowed a few days and drove an automobile, when he had one. He worked on the road some in 1926 and 1931. He drove a team a few days on the road. He denied that he was advised to go to the hospital, but said that he didn't remember the time he was requested to go to the hospital; that he went to Dr. Wells in 1923. He denied that anyone had recommended an operation and hospital treatment, as shown by exhibits produced. On redirect he testified that he helped in the management of fifteen to forty acres since he came out of the army; that he drove a team a part of the time; that he never performed a full day's work on the highway; that he can sit down without it hurting him and drive an automobile and operate it; that his brother-in-law farmed with him two years; and that his step-son and another boy did the work. He remembered that Dr. Wetzel examined him in March, 1920.

He produced four other lay witnesses. The first one testified that he visited plaintiff occasionally on the farm; that he never saw plaintiff doing any work; that his condition was good when he went to the army. Asked if he knew anything about plaintiff's physical condition, he said: "Nothing, only what I observed." He said that he had not seen him work any; that he might have worked when he did not see him. He gave no dates of meeting or seeing Gower.

The second witness testified that he had visited plaintiff in his home; that plaintiff looked like he had been suffering. He was not in bed but would lie with his clothes on— "Just seemed to be resting." He knew that plaintiff drove a team on the road, but knew nothing about his work since he came from the army.

The third witness testified that he lived three miles from the plaintiff; that his condition was good when he went to the army; that his health after return seemed to be bad; that he had not known him to work regularly at anything; that plaintiff went out to Western Oklahoma in 1926; prior to that time he would see plaintiff about once a month; "he did not know whether plaintiff worked or not."

The fourth witness testified that plaintiff's condition was good before he went to the army; that since he came back he looked awfully bad, sometimes looked like he would die. He had never visited plaintiff's home when he was sick. His brother-in-law and step-children would do most of the work. Plaintiff did chores. He was a good worker before he went to the army. He did not know how much work plaintiff did.

Three physicians were then called as witnesses by plaintiff. Dr. Wells testified that he had examined plaintiff since he came out of the army; had found him suffering from prolapsed rectum, which created a lot of nervous reflexes; did not remember that he treated plaintiff; that plaintiff's condition might make him sick to his stomach and cause him pain, especially about the hips and stomach; that the condition was chronic and strenuous work would aggravate it; that he did not know whether his condition can be cured by an operation; that he was not a rectal surgeon; that he ought to be treated by a specialist. The witness gave no dates of his examinations.

Dr. Schrader testified that he had examined plaintiff some time ago, about a week before he testified; found him suffering from prolapsed rectum; that his condition is chronic and permanent; that he looked emaciated and thin; that he thought plaintiff could not pursue any substantially gainful work; that he had been continuously unable to pursue any substantially gainful work from the time his then condition had its ori-

gin; that he was not a surgeon and could not say whether an operation at the inception of the disease would have been beneficial. Plaintiff could run an elevator, drive an automobile or truck part of the time, but could not load or unload them. He was not prepared to say whether plaintiff would be cured if he had proper hospitalization and an operation. He thought that was a question for a specialist in rectal diseases. The witness gave no dates of his examinations or whether he made any except the one about a week before the trial.

Dr. King was recalled and testified that he prescribed for plaintiff two or three times; that he had a prolapsed rectum to a considerable degree, bleeding considerable at times; that plaintiff would be all right some days and all wrong other days; that according to the history of the case an operation would be dangerous; that plaintiff's condition was probably permanent, reasonably certain to continue as long as he lived. When asked whether he knew if plaintiff was totally disabled in 1919, 1920 and 1921, he answered: "No, Sir." He further testified that if plaintiff's condition was the same as when he was discharged from the army he could not pursue any gainful occupation without suffering a great deal of pain and aggravating his condition.

At the close of plaintiff's evidence the defendant's motion for directed verdict was denied.

The defendant then introduced three lay witnesses. The first one lived about three miles from plaintiff and had known him for about twenty-five years. He first saw him after his return from the army about 1925; would see him passing by witness' place going to town. Sometimes plaintiff drove a car, sometimes a team. Plaintiff's physical appearance was then about the same as it is now. Talked with plaintiff several times, and never heard him complain, never complained of anything being wrong with him.

The second witness lived a half mile from plaintiff. Plaintiff had lived at several places, part of the time just across the road from witness. In 1921 plaintiff farmed right across the road from witness and did all kinds of farm work such as plowing and driving a team, and seemed to do the work like an ordinary farmer; never heard the plaintiff complain. He raised corn and cotton and worked some on the road in 1921. Witness saw him run a scraper and build a rock wall, worked just like the ordinary hand on the road. Plaintiff left the place across the road

and was gone about a year or a little more. The farm which plaintiff worked had 160 acres.

The third witness had known plaintiff since 1914. Plaintiff had lived in the neighborhood, but moved around to different places. Plaintiff came home from the army in 1918, and witness saw him about six months after he came home. He could not see any difference from the way he looked when he came home than when he left to go to the army. Plaintiff was farming in 1920, and witness saw him once in awhile and saw him plowing and cultivating a patch of cotton and some corn; never heard plaintiff complain about his physical condition until about eighteen months before the trial. At that time witness lived about half a mile from plaintiff. He saw plaintiff working on the road driving a team and building a wall on Sand Creek at the west point of the bridge. There was no one helping him at that time. He has seen plaintiff plowing by himself, working like an ordinary farmer. Plaintiff's condition looked like that of the ordinary fellow in the field. He had seen plaintiff driving an automobile. He talked to plaintiff about an hour when he was building the wall. Plaintiff has a step-son who does the bigger part of the work on the farm.

In rebuttal plaintiff testified that he worked only a little while building the rock wall; that he was helping another man. He also denied the testimony of other witnesses that he did all kinds of farm work in 1921. He testified that he was in Western Oklahoma in 1927, 1928 and 1929 picking cotton; that he didn't pick but his family picked the cotton.

The defendant also introduced vouchers for work represented to have been done by plaintiff on the highway for which he was paid $37.50 for work in September and October, 1931, $67.00 for work done in October and September, 1921, and $7.25 for work done in January, 1931.

Defendant introduced an exhibit showing that plaintiff was examined by Dr. Wall on February 8, 1922; that at that time plaintiff's rectum was everted to a very great degree. Prognosis not good. Recommended that plaintiff be hospitalized and a suitable operation be had for cure. Also an exhibit showing an examination of plaintiff by Dr. Wall on February 6, 1923, and again recommending an operation, saying that a Moschowitz operation would effect a cure; that plaintiff was not fit for much work until his condition was cured; and that plaintiff would grow

worse until relieved by an operation. Also an examination by Dr. Scott on November 12, 1919. He gave a history of the case and said: "Prognosis good if operated on, and that claimant could resume former occupation. Hospital care recommended." Also an examination by Dr. Wetzel on March 18, 1920, in which he reported prognosis poor. Advised treatment at hospital, but claimant would not accept treatment. He was not able to resume pre-war occupation and pre-war occupation not advised. Also report of examination by Dr. King February 14, 1921, saying claimant at that time was in need of modified operation for prolapsed rectum, but on account of financial condition could spare neither time nor money, and claimant would not accept hospital care. Prognosis fair.

When both parties rested the defendant again moved for an instructed verdict, which was denied. We think the court erred in denying this motion. The vital issue on the merits was whether plaintiff was totally and permanently disabled on October 1, 1918. There is no doubt that at that time he was suffering from a prolapsed rectum, which was painful, and his disability may have been total at that time, but there is no proof that it was then permanent, nor was the character of his disabiliy such that he could determine whether or not it was permanent. It seems apparent that only those skilled in surgery and the medical profession could speak intelligently on that subject, and the record tends strongly to show that competent witnesses were of the opinion that it was curable by an operation. There is no proof or suggestion to the contrary on the part of the witnesses for the plaintiff. One professional witness called by the plaintiff would not say that plaintiff was totally disabled in 1919, 1920 and 1921. Another testified that he did not know whether plaintiff's condition at the time in question could be cured by an operation; that he was not a rectal surgeon; and that plaintiff should be treated by a specialist. The record indicates that plaintiff declined to take such treatment, or at least that he did not seek it or take it. Moreover, his long delay (13 years) in claiming liability refutes his contention that he was totally and permanently disabled. Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 78 L. Ed. 492. If it was curable, plaintiff was not totally and permanently disabled as he claimed. The point was suggested throughout the trial, but there was no substantial testimony to aid the jury in deciding in favor of plaintiff. The jury was left in doubt and conjecture. United States v. McShane (C. C. A. 10) 70 F. (2d) 991, opinion filed May 9, 1934, and cases therein cited; United States v. Hill (C. C. A.) 62 F.(2d) 1022; Wise v. United States (C. C. A.) 63 F.(2d) 307.

The statute of limitation relied on in the answer as a bar is found in the second paragraph of the fourth section of the act of July 3, 1930 (38 USCA § 445). Insofar as is material it reads thus:

"No suit on yearly renewable term insurance shall be allowed under this section unless the same shall have been brought within six years after the right accrued for which the claim is made or within one year after the date of approval of this amendatory Act [July 3, 1930], whichever is the later date: * * * Provided, That for the purposes of this section it shall be deemed that the right accrued on the happening of the contingency on which the claim is founded: Provided further, That this limitation is suspended for the period elapsing between the filing in the bureau of the claim sued upon and the denial of said claim by the director."

The policy sued on in this case is what is known as yearly renewable term insurance. Appellee filed his claim with the bureau on June 20, 1931. Only thirteen days remained between the date the claim was filed and July 3, 1931. During that time and the succeeding time until the claim was disallowed, the running of the statute was suspended, and it began to run again immediately on its disallowance, and the bar took effect according to the terms of the act thirteen days thereafter. The disallowance of his claim, according to the record, was on December 19, 1931, by the Insurance Claims Council, and the director on December 23, 1931, wrote a letter to appellee's attorney, who had theretofore been corresponding with the bureau about the claim, and enclosed in the letter a notification that the claim had been so disallowed. There is no proof in the record that appellee's attorney did not receive this notification within due course and within the usual time of transmission, which is about four days from Washington to the attorney's address in Oklahoma. Appellee testified that he personally had no notification of the denial of the claim until January 8, 1932, and later it was attempted to show that he was mistaken in that date and that his knowledge of the denial of the claim was not until January 18, 1932. That may be true, but we see no reason why he should not be bound as of the date of the denial of the claim, which is in accord with

the plain meaning of the statute. But whether we take that date or the date on which notification came to his attorney the bar had run when the suit was instituted on January 20, 1932. Notification to his attorney, who carried on correspondence with the Veterans' Bureau concerning the claim, was notification to him. We applied this statute in Roberts v. United States (C. C. A.) 66 F. (2d) 273. What we said there is applicable here. See, also, Stallman v. United States (C. C. A.) 67 F.(2d) 675; Hipkins v. United States (D. C.) 1 F. Supp. 505; Carson v. United States (D. C.) 37 F.(2d) 946. Appellee sat by for one year less thirteen days after this statute was passed before filing his claim with the bureau. No reason is assigned for this delay. We think the plea in bar was well taken and should have been sustained.

Reversed and remanded.